IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

**ORIGINAL**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

AUG 29 2001

DAVID J. MALAND, CLERK

BY _____
DEPUTY

| | |
|---|---|
| SALOMON SMITH BARNEY INC., | § |
| | § |
| *Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| STEPHEN M. MILLS, STUART B. BAYS, | § |
| JACQUELINE F. EDMISTON, AND | § |
| REBECCA WILLIAMS, | § |
| | § |
| *Defendants.* | § |

No. _____

6:01 CV 396

## PLAINTIFF'S VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF IN AID OF ARBITRATION

Plaintiff Salomon Smith Barney Inc. ("SSB") files this Verified Complaint against Stephen M. Mills ("Mills"), Stuart B. Bays ("Bays"), Jacqueline F. Edmiston ("Edmiston"), and Rebecca Williams ("Williams") (collectively "Defendants").

## INTRODUCTION

On Friday, August 24, 2001, the Defendants, two SSB Financial Consultants, a SSB Registered Sales Assistant, and a SSB paid Intern resigned abruptly, unexpectedly and without any prior notice. They all immediately started working at Prudential Securities Incorporated ("Prudential"), a direct competitor of SSB. In the brief time since their defection, SSB has discovered that the Defendants, individually and/or in concert, misappropriated confidential and proprietary information regarding SSB clients and are using that information to solicit SSB clients to transfer their accounts to Prudential, Defendants' new employer. This conduct is in violation of Defendants' agreements with SSB and Texas law. SSB also believes that Defendants printed out and took several SSB client profile reports containing significant confidential information regarding

SSB clients. Further, SSB's computer database regarding numerous SSB clients serviced by Mills and Bays was apparently altered shortly prior to Defendants' resignations. Based on these actions, and on information and belief, SSB asserts that Defendants, now direct competitors of SSB, have engaged in a campaign to wrongfully use and disclose SSB's confidential and proprietary information and solicit SSB's customers for their personal benefit and the benefit of Prudential, their new employer, in breach of their agreements with and duties to SSB.

This is an action for temporary and preliminary injunctive relief, pending an arbitration hearing on the merits before the National Association of Securities Dealers ("NASD") under Rule 10335(g) of the NASD Code of Arbitration Procedure, resulting from Defendants' (i) breach of contract; (ii) breach of fiduciary duty; (iii) misappropriation of trade secrets and confidential information; (iv) and unfair competition; and (v) tortious interference with contractual and business relations.[1] In breach of their contractual and common law duties, Defendants, on information and belief, have willfully and maliciously misappropriated SSB's customer information trade secrets and used this information to solicit SSB's customers. Unless this court restrains them, Defendants will continue his unlawful activity to the immediate and irreparable harm of SSB.

## PARTIES, JURISDICTION, AND VENUE

1.      SSB is a New York corporation with its principal place of business in New York, New York. SSB is duly registered and licensed to do business in Texas.

---

[1] Plaintiff is preparing and will file a Claim in Arbitration with the National Association of Securities Dealers, Inc.

2. Defendants are all citizens of the State of Texas, where they have resided and worked at all relevant times. They may be served during business hours at their place of employment, Prudential Securities Incorporated, 6101 South Broadway, Suite 490, Tyler, Texas, 75703.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The Court has personal jurisdiction over Defendants because they reside in the State of Texas.

4. Based on 28 U.S.C. § 1391 (a), venue is proper in this Court because Defendants reside in this district, and Defendants have committed and continue to commit unlawful acts in this district for which they are liable.

## THE FACTS

### A. The Parties.

5. SSB is a full service brokerage firm that, among other things, maintains client brokerage accounts and assists clients in trading stocks, bonds, and other financial investments. (Ex. 1, Steve Balaban Affidavit at ¶ 1).

6. Mills was a Financial Consultant at SSB's Tyler, Texas office until his August 24, 2001 resignation. As a Financial Consultant, Mills served as a broker for SSB client accounts. (Balaban Affidavit at ¶¶ 4-5).

7. Bays was a Financial Consultant at SSB's Tyler, Texas office until his August 24, 2001 resignation. As a Financial Consultant, Bays served as a broker for SSB client accounts. (*Id.*)

8. Edmiston was a Registered Sales Assistant at SSB's Tyler, Texas office until her August 24, 2001 resignation. As a Registered Sales Assistant, Edmiston assisted SSB's Financial

Consultants in all aspects of their duties, including, without limitation, executing trades, preparation of documents, and communicating frequently with SSB clients.  (*Id.* at ¶¶ 4, 6).

9.      Williams was a paid Intern at SSB's Tyler, Texas office until her August 24, 2001 resignation.  As a paid Intern, Williams assisted SSB's Financial Consultants in numerous aspects of their duties, including, without limitation, preparation of documents, marketing activities and creation of client performance reports.  (*Id.* at ¶¶ 4, 7).

**B.      Without Prior Notice, Defendants Suddenly and Unexpectedly Resign and Join SSB'S Direct Competitor.**

10.      On Friday, August 24, 2001, Defendants submitted resignation letters to SSB in which they all stated that they were resigning effective immediately. (Ex. 2, Resignation Letters). SSB had no prior notice of Defendants' resignations.    (Balaban Affidavit at ¶¶ 9).

11.      After resigning from SSB, Defendants immediately went to work for Prudential in its Tyler, Texas branch.  Prudential is one of SSB's direct competitors.  (*Id.*)

**C.      SSB Learns of Defendants' Soliciting SSB's Clients and the Taking of Confidential Information and Wrongful Competition.**

12.      Shortly after Defendants defected from SSB to join Prudential, SSB learned that Mills and Bays had already solicited SSB's clients on behalf of Prudential, in violation of their agreements with SSB.  Attached as Exhibit 3 is a true and correct copy of a solicitation letter from Mills and Bays to Farrell Blevins, a client of SSB whose account was serviced by Mills and Bays, seeking to have Mr. Blevins transfer his SSB account to Prudential.  Mr. Blevins received the solicitation letter on Saturday, August 25, 2001, along with completed documentation for the transfer of his SSB account to Prudential.  (Balaban Affidavit at ¶ 10).  Mills and Bays resigned on the afternoon of August 24, 2001.  Therefore, on information and belief, the documents received by Mr. Blevins were

prepared and completed while Mills and Bays were employed by SSB. Bays also solicited those SSB clients whose accounts he had serviced individually while employed at SSB. Attached as Exhibit 4 hereto is a true and correct copy of the solicitation letter from Bays to Ken Good, a client of SSB whose account was serviced by Bays, seeking to have Mr. Good transfer his SSB account to Prudential. Mr. Good also received the solicitation letter on Saturday, August 25, 2001, along with completed documentation for the transfer of his account to Prudential. (Balaban Affidavit at ¶ 10). Bays resigned on the afternoon of August 24, 2001. Therefore, on information and belief, the documents received by Mr. Good were prepared and completed while Bays was employed by SSB. (Balaban Affidavit at ¶ 10). Mills also telephoned clients referred to him by SSB and asked them to transfer their accounts to Prudential. (*Id.* at ¶ 11).

13.     On Wednesday, August 22, 2001 and Thursday, August 23, 2001, the two days before the day Defendants defected to Prudential, Diane Hellen ("Hellen"), another SSB Financial Consultant, observed Edmiston printing numerous SSB Client Profile Reports (which contain a wealth of information about SSB's clients, including, without limitation, client contact information, financial information, and investment objectives) from the SSB computerized database. Upon comment by Hellen as to the large number of Client Profile Reports being printed, Edmiston represented to Hellen that she was printing the profile reports for her backup files. (*Id.* at ¶ 12; Ex. 6, Diane Hellen Affidavit at ¶¶ 3-4).

14.     After Defendants' group resignation on Friday, August 24, 2001, Hellen informed SSB's Tyler office Branch Manager, Steve Balaban ("Balaban") of Edmiston's printing of the Profile Reports. SSB then searched the files remaining at SSB, and the Profile Reports were not found. (Balaban Affidavit at ¶ 13). On information and belief, Defendants removed the confidential SSB

Client Profile Reports and took them to Prudential. Also, upon information and belief, Edmiston took an extensive notebook of SSB's forms, processes and policies. It has been missing since Edmiston quit her employment with SSB. (*Id.* at ¶ 16).

15.     On information and belief, Defendants have and will continue to use and disclose SSB's confidential information to solicit additional SSB clients to transfer their accounts to Prudential. Also, on information and belief, Prudential has or will pay Defendants a substantial initial bonus for the sole purpose of compensating Defendants for transferring SSB's clients to Prudential. (*Id.* at ¶ 14).

16.     After Defendants' abrupt resignations, SSB checked its computer system to determine if any client information had been altered prior to the Defendant' departure. SSB has determined that many of its client profiles for SSB clients previously serviced by Mills and Bays have apparently been altered. Specifically, it appears the clients' correct telephone numbers were deleted and/or altered and, in some instances, Edmiston's work telephone number was substituted in its place. SSB also determined that several profiles of the SSB clients previously serviced by Mills and Bays were last accessed during the week before Defendants' resignations from SSB. (*Id.* at ¶ 15).

**D.     Mills's Agreements with SSB.**

17.     Mills was a long time employee of SSB or predecessor firms. On May 8, 1998, Mills entered into an Account Referral/Assigned Lead Agreement ("Referral Agreement") with SSB.[2] In the Referral Agreement, SSB assigned certain accounts (the "referred accounts") to Mills in exchange for Mills's agreement to certain covenants, including Mills's agreement to not solicit the

---

[2] The Referral Agreement is with Smith Barney, a predecessor company to SSB. Accordingly, SSB is a successor to the Referral Agreement.

referred accounts for a period of one year should he resign and to maintain the confidentiality of

SSB's proprietary information regarding the referred accounts. (Ex. 7, Mills Referral Agreement;

Balaban Affidavit at ¶ 16).

18.     In the Referral Agreement at paragraph 4, Mills (referred to in the Agreement as

"FC," "I," or "me") agreed to the following regarding SSB's confidential information:

> **4.     Confidential Information.** The FC recognizes and agrees
> that ***all records*** whether original, duplicated, computerized,
> memorized, handwritten, or in any other form, and ***all information***
> contained therein, including names, addresses, phone numbers, and
> financial information of the Assigned Accounts, Assigned Leads and
> Related Accounts are confidential and are the sole and exclusive
> property of Smith Barney. This information, whether provided to me
> by Smith Barney or by any Assigned Accounts, Assigned Leads and
> Related Accounts, is entrusted to me as an employee and sales
> representative of Smith Barney. I will not use this information or
> remove any records pertaining thereto from any Smith Barney office
> except for the sole purpose of conducting business on behalf of Smith
> Barney. I agree not to divulge or disclose this information or any
> records pertaining thereto, to any competitor of Smith Barney either
> during my employment or at any time thereafter. (Emphasis added).

(Ex. 7, Mills Referral Agreement ¶ 4; Balaban Affidavit at ¶ 17).[3]

19.     Mills also agreed to a non-solicitation covenant in Referral Agreement paragraph 5:

> **5.     Covenant Not to Solicit.** If, at any time, I resign from Smith
> Barney, . . . **I agree that for a period of one year following my
> termination I will not solicit by mail, by phone, by personal
> meeting, or by any other means, either directly or indirectly, any
> of the Assigned Accounts, Assigned Leads or Related Accounts.**

---

[3] In addition to this confidentiality covenant, Mills also had signed a Confidential Information Agreement (the agreement is with E. F. Hutton & Company, Inc.; SSB is a successor of Hutton's rights under this agreement in which he agreed to keep SSB client information confidential and to return, at the time of his employment termination, all documents containing SSB confidential information. (*See,* Ex. 8, Mills Confidentiality Agreement). *See also,* Balaban Affidavit at ¶ 18. Mills also had signed off on SSB's Employee Handbook, which contains a policy requiring Mills to safeguard confidential information. (Ex. 9, Confidentiality Policy & Defendants' Handbook Receipts).

My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any such account:

> (a)   to transfer from Smith Barney to me or to my new employer, or

> (b)   to open a new account with me or with my new employer, or

> (c)   to otherwise discontinue its patronage and business relationship with Smith Barney.

(Ex. 7, Mills Referral Agreement ¶ 5; Balaban Affidavit at ¶ 20).  (Emphasis added).

20.    When he signed the Agreement, Mills also agreed to the issuance of the relief SSB

requests in this suit:

> **6.    Breach of Covenants.**  In the event I breach any of the covenants of paragraphs 4 or 5, I agree that Smith Barney will be entitled to injunctive relief. I recognize that Smith Barney will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Smith Barney or to protect and preserve the status quo.  Therefore, **I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION** ordering:

>> (a) that I immediately return to Smith Barney all records relating to the Assigned or Related Accounts or Assigned Leads whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

>> (b) that, for a period of one year, I be enjoined and restrained from soliciting any Assigned or Related Account or Assigned Lead; and

>> (c) that I be further enjoined and restrained, for a period of one year, from accepting business from any

-8-

> Assigned or Related Account or Assigned Leads
> solicited in violation of paragraph 5 or whose records
> and information was used in violation of paragraph 4.

(Ex. 7, Mills Referral Agreement ¶ 6; Balaban Affidavit at ¶ 21). (Emphasis added).

**E.     Bays's Agreements with SSB.**

21.     On May 8, 1998, Bays entered into a Referral Agreement identical to Mills's Referral Agreement described above. (Ex. 10, Bays Referral Agreement; Balaban Affidavit at ¶ 25). In exchange for Bays' agreement not to solicit any referred accounts for a period of one year following the termination of Bays' employment with SSB, SSB client accounts were assigned to Bays.

22.     On May 27, 1992, Bays also entered into a Financial Consultant Training Contract ("Training Contract") with SSB.[4] The Training Contract required Bays to keep SSB's proprietary client information confidential. It also contained the following non-solicitation covenant:

> **A.     Covenant not to solicit.** If I leave Shearson Lehman Brothers
> for any reason *I will not, within six (6) months of my leaving solicit*
> *any of the clients I serviced at Shearson Lehman Brothers or any*
> *clients I learned of during my employment at Shearson Lehman*
> *Brothers.*

(Ex. 11, Bays Training Contract at 1; Balaban Affidavit at ¶ 22). (Emphasis added).

23.     On June 6, 1992, Bays also signed a Confidentiality Agreement (the agreement is with Shearson, however, as explained previously, SSB is a successor to this agreement) in which he agreed to keep SSB client information confidential and to return, at the time of his employment termination, all documents containing SSB confidential information. (Ex. 12, Bays Confidentiality Agreement; Balaban Affidavit at ¶ 23). Bays has also signed off on SSB's Employee Handbook,

---

[4] The Training Contract is with Shearson Lehman Brothers; however, SSB is a successor in interest to the Training Contract.

which contains a policy requiring Bays to safeguard confidential information. (Ex. 9, Confidentiality Policy & Defendants' Handbook Receipts).

**F.     Edmiston's Agreements with SSB.**

24.     On December 12, 1992, Edmiston also signed a Confidentiality Agreement in which she agreed to keep SSB client information confidential and to return, at the time of her employment termination, all documents containing SSB confidential information. (Ex. 13, Edmiston Confidentiality Agreement). Edmiston has also acknowledged receipt of and an agreement to be bound by SSB's Employee Handbook, which contains a policy requiring Edmiston to safeguard confidential information. (Ex. 9, Confidentiality Policy & Defendants' Handbook Receipts; Balaban Affidavit at ¶ 24).

25.     On March 29, 1996, Edmiston entered into a Sales Assistant Agreement with Smith Barney, SSB's predecessor. The Sales Assistant Agreement: (i) prohibits Edmiston from using or disclosing SSB's confidential information; (ii) requires her to return SSB confidential information upon her termination; (iii) prohibits her from soliciting SSB's customers for twenty-four (24) months following her termination; and (iv) entitles SSB to obtain an injunction restraining her from soliciting SSB's customers and using or disclosing SSB's confidential information. (Ex. 14, Edmiston Sales Assistant Agreement; Balaban Affidavit at ¶ 26).

**G.     Williams's Agreements with SSB.**

26.     On April 24, 2001, Williams signed a Confidential/Proprietary Information Acknowledgment with SSB in which she agreed: (i) to keep SSB client information confidential; (ii) to return, at the time of her employment termination, all documents containing SSB confidential information; and (iii) that SSB may obtain an injunction against her to prevent her breach of the

-10-

agreement. (Ex. 15, Williams Confidentiality Agreement).  Williams also signed off on SSB's Employee Handbook, which contains a policy requiring Williams to safeguard confidential information. (Ex. 9, Confidentiality Policy & Defendants' Handbook Receipts; Balaban Affidavit at ¶ 27).

**H.    SSB Protects Its Trade Secrets and Confidential Information**

27.    To protect itself from unfair competition, SSB makes substantial efforts to ensure the confidentiality of information concerning its clients.  In addition to the contractual provisions set forth above, SSB requires its financial consultants and sales assistants to abide by employee policies and procedures that specifically treat client information as SSB property and prohibit the use or disclosure of this information other than in connection with SSB's business.  Moreover, SSB maintains policies safeguarding client information to protect customers' privacy interests and keep this information strictly internal so that it does not fall into the hands of SSB's competitors.  These policies prohibit providing SSB client information to any third party.  Obviously, any disclosure of SSB's confidential client information to competitors would give those competitors a substantial, unfair advantage in soliciting SSB's customers.  (Balaban Affidavit at ¶ 28).

28.    The SSB branch in which Defendants worked exerts substantial efforts to maintain the secrecy and confidentiality of SSB's client records, including information identifying its clients. SSB keeps its office locked and secure during non-working hours, and a security firm monitors the building.  The computer system is password-protected, and only the broker, his or her sales assistant, the branch manager, and necessary operational personnel have access to the broker's account information.  Financial consultants and sales assistants do not have access to other financial consultants' account information unless authorized.  Customer information that SSB is required to

maintain is kept secure in the broker's offices or in the operations area, a locked, restricted area. SSB also incinerates its clients' statements after a length of time. (Balaban Affidavit at ¶ 29).

29.     SSB derives actual and potential economic value from its customer information and customer lists in part because this information is not generally known to, and not readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use. (Balaban Affidavit at ¶ 30).

### Count One – Breach of Contract

30.     SSB incorporates by reference paragraphs 1 through 29, above.

31.     Defendants have materially breached their agreements with SSB by (i) using and disclosing SSB's confidential information; (ii) removing SSB's confidential information for purposes other than conducting SSB's business; and (iii) soliciting SSB's customers.  Further, Defendants will continue to commit such breaches unless this court restrains them from doing so.

32.     SSB has fulfilled in all material respects all of its contractual obligations under its agreements with Defendants.

33.     Therefore, SSB is entitled to a temporary restraining order and a preliminary injunction requiring Defendants and anyone acting in concert with them or any of them to return the confidential information and records that he removed form SSB and enjoining them from (i) using or disclosing SSB's confidential information; (ii) soliciting (directly or indirectly) any of the clients they serviced while employed with SSB or learned about from SSB's confidential information or during their SSB employment; and (iii) accepting any accounts or business from any clients that they have already wrongfully solicited.

## Count Two – Breach of Fiduciary Duty

34.    SSB incorporates by reference paragraphs 1 through 33, above.

35.    As SSB employees, Defendants owed fiduciary duties to SSB under Texas law. These fiduciary duties include a duty to maintain the confidence and secrecy of SSB's client information and not to disclose this information to SSB's competitors, and duties of loyalty, honesty, utmost good faith, and no self-dealing.

36.    Defendants have breached their fiduciary duties to SSB by copying or otherwise removing SSB's client information from SSB's premises and improperly using and disclosing this information in an effort to pirate away SSB's client accounts.

37.    Therefore, SSB is entitled to a temporary restraining order and a preliminary injunction enjoining Defendants and anyone acting in concert with them or any of them from (i) any further use or disclosure of SSB's confidential information; and (ii) accepting any accounts or business from any SSB client whose confidential information Defendants disclosed to Prudential, or any third parties, or used to solicit accounts or business for Prudential.

## Count Three – Misappropriation of Trade Secrets and Confidential Information

38.    SSB incorporates by reference paragraphs 1 through 37, above.

39.    SSB's client lists and client information constitute trade secrets and confidential information under Texas common law.

40.    Defendants obtained SSB's trade secrets and confidential information, including, without limitation, SSB's client lists and client information, by improper means, including theft, breach of contractual duty, and breach of fiduciary duty.

41.     The SSB trade secrets and confidential information that Defendants obtained improperly are known only to SSB and those to whom SSB disclosed the information in confidence. The trade secrets and confidential information are not matters of public knowledge of generally known within the industry. Moreover, SSB has taken reasonable precautions to preserve the secrecy of the trade secrets and confidential information.

42.     SSB obtained its trade secrets and confidential information after expending substantial time, efforts, and expense. Additionally, SSB's trade secrets and confidential information have enabled it to obtain a fair and lawful competitive advantage over those who do not know or have the right to use its trade secrets and confidential information.

43.     Defendants' misappropriation of SSB's trade secrets and confidential information was and is willful and malicious because he intentionally attempted to benefit from using and disclosing SSB's trade secrets and confidential information to the injury of SSB. Defendants were well aware that the information they used and disclosed was to remain confidential and knew of the importance of its confidentiality to SSB.

44.     If not immediately enjoined from doing so, Defendants will continue to unlawfully use and disclose SSB's trade secrets and confidential information.

45.     If not immediately enjoined from doing so, Defendants' unlawful use and disclosure of SSB's trade secrets and confidential information will continue to injure SSB, and SSB has no adequate remedy at law for this irreparable injury.

### Count Four – Unfair Competition

46.     SSB incorporates by reference paragraphs 1 through 45, above.

-14-

47.    Defendants' conduct described above constitutes unfair competition under Texas law. Defendants actively participated in, induced, or conspired to carry out all of the acts of unfair competition outlined above.  Moreover, Defendants' acts of unfair competition are willful and intentional.

48.    Unless this court enjoins them from doing so, Defendants will continue their acts of unfair competition, causing SSB immediate, irreparable damage for which it has no adequate remedy at law.

**Count Five – Tortious Interference**

49.    SSB incorporates by reference paragraphs 1 through 48 above.

50.    Defendants, individually and in concert with one another, tortiously interfered with SSB's existing contractual relationships or prospective business relationships, without legal justification.  Defendants conduct was willful and malicious and designed to harm SSB while enriching Defendants and their new employer.

51.    If not immediately enjoined from doing so, Defendants will continue to unlawfully interfere with SSB's contractual relationships and prospective business relations.  This conduct, if not immediately restrained will continue to injure SSB and SSB has no adequate remedy at law for this irreparable injury.

52.    Therefore, SSB is entitled to a temporary restraining order and a preliminary injunction requiring Defendants to return the trade secrets, confidential information, and records that they removed form SSB and enjoining Defendants and anyone acting in concert with them or any of them from (i) tortiously interfering with SSB's existing contractual relationships; (ii) soliciting (directly or indirectly) any of the clients they serviced while employed with SSB or learned about

-15-

from SSB's confidential information or during their SSB employment; and (iii) accepting any accounts or business from any clients that they have already wrongfully solicited using SSB's trade secrets and confidential information.

53.     Therefore, SSB is entitled to a temporary restraining order and a preliminary injunction enjoining Defendants from any further acts of tortious interference.

Therefore, SSB respectfully demands:

(a)     with respect to Count One, a temporary restraining order and a preliminary injunction requiring Defendants and anyone acting in concert with them, including but not limited to any officer, employee, agent, or representative of Prudential, to return the confidential information and records that they removed from SSB and enjoining them from (i) using or disclosing SSB's confidential information; (ii) soliciting (directly or indirectly) any of the clients they serviced while employed with SSB or learned about from SSB's confidential information or during their SSB employment; and (iii) accepting any accounts or business from any clients that they have already wrongfully solicited.

(b)     with respect to Count Two, SSB is entitled to a temporary restraining order and a preliminary injunction enjoining Defendants and anyone acting in concert with them, including but not limited to any officer, employee, agent, or representative of Prudential, from (i) any further use or disclosure of SSB's confidential information; and (ii) accepting any accounts or business from any SSB client whose confidential information Defendants disclosed to Prudential, or any third parties, or used to solicit accounts or business for Prudential.

(c)     with respect to Count Three, a temporary restraining order and a preliminary injunction requiring Defendants and anyone acting in concert with them, including but not limited

-16-

to any officer, employee, agent, or representative of Prudential, return the trade secrets, confidential information, and records that they removed form SSB and enjoining them from (i) using or disclosing SSB's trade secrets and confidential information; (ii) soliciting (directly or indirectly) any of the clients they serviced while employed with SSB or learned about from SSB's confidential information or during their SSB employment; and (iii) accepting any accounts or business from any clients that they have already wrongfully solicited using SSB's trade secrets and confidential information.

(d)     with respect to Count Four, a temporary restraining order and a preliminary injunction enjoining Defendants from any further acts of unfair competition;

(e)     with respect to Court Five, a Temporary Restraining Order and a preliminary injunction enjoining Defendants from tortiously interfering with Plaintiff's existing contractual relationships and enjoining any further soliciting of SSB clients to transfer their accounts;

(f)     that the court set a hearing on SSB's request for a preliminary injunction; and

(g)     that the court grant SSB all other relief to which it is entitled.

Respectfully submitted,

*Thomas D. Cordell*   w/p Melissa M. Goodman

Thomas D. Cordell
ATTORNEY-IN-CHARGE
Texas Bar No.  04820600
1000 Louisiana, Suite 4300
Houston, Texas  77002
Telephone:     (713) 547-2000
Telecopier:     (713) 547-2075

OF COUNSEL:
HAYNES AND BOONE, L.L.P.
Melissa M. Goodman
Texas Bar No. 00790648
901 Main Street, Suite 3100
Dallas, Texas  75202-3789
Telephone:     (214) 651-5628
Telecopier:    (214) 200-0455
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

Based on the Federal Rules of Civil Procedure, I served a copy of this document by hand
delivery on August <u>29</u>, 2001 to:

Retta Miller, Esq.
JACKSON & WALKER, L.L.P.
901 Main St., Suite 6000
Dallas, TX 75202

Melissa M. Goodman

-18-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SALOMON SMITH BARNEY INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | No. _____ |
| | § | |
| STEPHEN M. MILLS, STUART B. BAYS, | § | |
| JACQUELINE F. EDMISTON, and | § | |
| REBECCA WILLIAMS, | § | |
| | § | |
| *Defendants.* | § | |

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF SMITH | § |

### AFFIDAVIT OF STEVE BALABAN

On this day, Steve Balaban, appeared before me, the undersigned Notary Public. Mr. Balaban is personally known to me and, upon his oath, deposed and stated as follows:

1.  "My name is Steve Balaban. I am over the age of 18 and am competent to make this Affidavit. I am the Branch Manager of SSB's Tyler, Texas branch. Salomon Smith Barney ("SSB") is a securities broker-dealer, a full service brokerage firm that, among other things, maintains client brokerage accounts and assists clients in trading stocks, bonds, and other financial investments. The facts stated in this Affidavit are within my personal knowledge and are true, based on my personal knowledge, investigation, and review of SSB's business records.

2.  As a broker-dealer, SSB is engaged in an intensely competitive business in the financial and securities industry. SSB competes with other broker-dealers for the financial and investment

business of customers. SSB spends enormous time and resources in training its registered representatives, or financial consultants, in how to attract and retain customers and build and service portfolios. SSB is also engaged in substantial advertising in an attempt to attract customers whose accounts will be serviced by SSB financial consultants.

3.    SSB's business is national in scope, and one of its key competitors in the United States is Prudential Securities Incorporated ("Prudential"). Both SSB and Prudential have offices in the Tyler, Texas metropolitan area.

4.    Stephen M. Mills ("Mills"), Stuart B. Bays ("Bays"), Jacqueline F. Edmiston ("Edmiston"), and Rebecca Williams ("Williams") (collectively "Defendants") were all employed at SSB's Tyler, Texas branch office until their sudden and unexpected resignations without notice on August 24, 2001.

5.    Mills and Bays were Financial Consultants. As Financial Consultants, Mills and Bays served as brokers for SSB client accounts.

6.    Edmiston was a Registered Sales Assistant. As a Registered Sales Assistant, Edmiston assisted SSB's Financial Consultants in all aspects of their duties, including, without limitation, executing trades, preparation of documents, and communicating frequently with SSB clients.

7.    Williams was a paid Intern. As a paid Intern, Williams assisted SSB's Financial Consultants in numerous aspects of their duties, including, without limitation, preparation of documents, marketing activities and creation of client performance reports.

8.    During their SSB employment, SSB provided Defendants with ongoing training, numerous client leads and referrals, and confidential and trade secret customer information.

- 2 -

Additionally, SSB provided Defendants with substantial support services, including ongoing sales and compliance training. In addition, Defendants also benefitted from SSB's extensive advertising campaigns and its reputation in the industry.

9.   On Friday, August 24, 2001, Defendants submitted resignation letters to SSB in which they stated that they were resigning effective immediately. True and correct copies of Defendants' resignation letters are attached to Plaintiff's Verified Complaint as Exhibit 1. SSB had no prior notice of Defendants' intent to resign. After resigning from SSB, Defendants immediately went to work for Prudential in its Tyler, Texas branch. Prudential is one of SSB's direct competitors.

10.   Shortly after Defendants defected from SSB to join Prudential, SSB learned that Mills and Bays had already solicited SSB's clients on behalf of Prudential, in violation of their agreements with SSB. Attached as Exhibit 3 to Plaintiff's Verified Complaint is a true and correct copy of a solicitation letter from Mills and Bays to Farrell Blevins, a client of SSB whose account was serviced by Mills and Bays, seeking to have Mr. Blevins transfer his SSB account to Prudential. Mr. Blevins stated that he received the solicitation letter on Saturday, August 25, 2001, along with completed documentation for the transfer of his SSB account to Prudential. As Mills and Bays only resigned on the afternoon of August 24, 2001, it is apparent that the documents received by Mr. Blevins were prepared and completed while Mills and Bays were employed by SSB. Attached as Exhibit 4 to Plaintiff's Verified Complaint is a true and correct copy of a solicitation letter from Bays to Ken Good, a client of SSB whose account was serviced by Bays, seeking to have Mr. Good transfer his SSB account to Prudential. Mr. Good stated that he received the solicitation letter on Saturday,

- 3 -

August 25, 2001, along with completed documentation for the transfer of his account to Prudential. As Bays only resigned on the afternoon of August 24, 2001, it is apparent that the documents received by Mr. Good were prepared and completed while Bays was employed by SSB. I have also spoken to several SSB clients whose accounts were referred to Bays during his employment with SSB. Bays has solicited those clients (among others) to transfer their account(s) to Prudential, in breach of his agreement not to solicit referred accounts for a period of one year following the termination of his employment with SSB.

11.     As described above, Mills has solicited SSB clients whose accounts he serviced while employed by SSB. Mills has also solicited clients referred to him by SSB to transfer their account(s) to Prudential, in breach of his agreement not to solicit referred accounts for a period of one year following the termination of his employment with SSB. *See*, Affidavit of Marina Schroeder attached as Exhibit 5 to Plaintiff's Verified Complaint; *see also* Exhibit 7 to Plaintiff's Verified Complaint. I also spoke with Rowland Saunders, a client of SSB whose account was serviced by Mills. Mr. Saunders stated that he had been called by Mills and that Mills asked Mr. Saunders to transfer his account to Prudential, Mills' new employer.

12.     On or about Thursday, August 23, 2001 and Friday, August 24, 2001, shortly before Defendants defected to Prudential, Dianne Hellen ("Hellen"), another SSB Financial Consultant, observed Edmiston printing numerous SSB Client Profile Reports (which contain a wealth of information about SSB's clients, including, without limitation, client contact information, financial information, and investment objectives) from the SSB computerized database. Upon a comment by Hellen as to the large number of Client Profile Reports being

- 4 -

printed, Edmiston represented to Hellen that she was printing the profile reports for her backup files.

13.    After Defendants' group resignation on Friday, August 24, 2001, Hellen informed me of Edmiston's printing of the profile reports. SSB then searched the files remaining at SSB, and the Profile Reports were not found. This leads me to the conclusion that Defendants removed the confidential SSB Client Profile Reports and took them to Prudential. Also, upon information and belief, Edmiston took an extensive notebook of SSB's forms, processes and policies. It has been missing from the office since Edmiston quit her employment.

14.    Given Defendants' work for Prudential and their other conduct as mentioned above, I believe that Defendants have and will continue to use and disclose SSB's confidential information to solicit additional SSB clients to transfer their accounts to Prudential. Also, based on my knowledge of Prudential's standard practices, I believe that Prudential has already or will pay Defendants a substantial bonus for the sole purpose of compensating Defendants for transferring SSB's customers to Prudential.

15.    After Defendants' abrupt resignations, SSB checked its computer system to determine whether any client records had been altered. SSB determined that many of its client profiles for clients serviced by Mills and/or Bays have apparently been altered. Specifically, it appears the clients' correct telephone numbers were deleted and/or altered. In some instances, Edmiston's work telephone number appeared in place of the client's number. SSB also determined that the client profiles were, in several cases, accessed and altered during the week before Defendants' resignations from SSB.

16.     Mills was a long time employee of SSB or predecessor firms. On May 8, 1998, Mills entered
into an Account Referral/Assigned Lead Agreement ("Referral Agreement") with SSB.[1] In
the Referral Agreement, SSB assigned certain client accounts to Mills in exchange for
Mills's agreement to certain covenants, including Mills's agreement to not solicit the referred
accounts should he resign and to maintain the confidentiality of SSB's proprietary
information regarding the referred accounts. A true and correct copy of Mills's Referral
Agreement is attached to Plaintiff's Verified Complaint as Exhibit 7.

17.     In the Referral Agreement at paragraph 4, Mills (referred to in the Agreement as "FC," "I,"
or "me") agreed to the following regarding SSB's confidential information:

> **4.     Confidential Information.** The FC recognizes and agrees
> that *all records* whether original, duplicated, computerized,
> memorized, handwritten, or in any other form, and *all information*
> contained therein, including names, addresses, phone numbers, and
> financial information of the Assigned Accounts, Assigned Leads and
> Related Accounts are confidential and are the sole and exclusive
> property of Smith Barney. This information, whether provided to me
> by Smith Barney or by any Assigned Accounts, Assigned Leads and
> Related Accounts, is entrusted to me as an employee and sales
> representative of Smith Barney. I will not use this information or
> remove any records pertaining thereto from any Smith Barney office
> except for the sole purpose of conducting business on behalf of Smith
> Barney. I agree not to divulge or disclose this information or any
> records pertaining thereto, to any competitor of Smith Barney either
> during my employment or at any time thereafter (emphasis added).

18.     In addition to this confidentiality provision, Mills also had signed a Confidential Information
Agreement (the agreement is with E. F. Hutton & Company, Inc.; SSB is a successor to
Hutton's rights under this agreement) in which he agreed to keep SSB client information

---

[1] The Referral Agreement is with Smith Barney, a predecessor company to SSB. SSB is a successor
to the Referral Agreement.

confidential and to return, at the time of the termination of his employment with SSB, all documents containing SSB confidential information. A true and correct copy of Mills's Confidential Information Agreement is attached to Plaintiff's Verified Complaint as Exhibit 9.

19.    Mills also acknowledged his receipt of and agreement to be bound by SSB's Employee Handbook, which contains a policy requiring Mills to safeguard SSB's confidential information. True and correct copies of SSB's Confidentiality Policy and Defendants' employee handbook receipt acknowledgments are attached to Plaintiff's Verified Complaint as Exhibit 9.

20.    Mills also agreed to a non-solicitation covenant in Referral Agreement paragraph 5:

> **5.    Covenant Not to Solicit.** If, at any time, I resign from Smith Barney, . . . *I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any of the Assigned Accounts, Assigned Leads or Related Accounts.* My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any such account:
>
> (a)    to transfer from Smith Barney to me or to my new employer, or
>
> (b)    to open a new account with me or with my new employer, or
>
> (c)    to otherwise discontinue its patronage and business relationship with Smith Barney (emphasis added).

21.    When he signed the Agreement, *Mills also agreed to the issuance of injunctive relief against him should he breach his agreements with SSB:*

- 7 -

6.    **Breach of Covenants.** In the event I breach any of the covenants of paragraphs 4 or 5, I agree that Smith Barney will be entitled to injunctive relief. I recognize that Smith Barney will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Smith Barney or to protect and preserve the status quo. Therefore, **I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:**

> (a) that I immediately return to Smith Barney all records relating to the Assigned or Related Accounts or Assigned Leads whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

> (b) that, for a period of one year, I be enjoined and restrained from soliciting any Assigned or Related Account or Assigned Lead; and

> (c) that I be further enjoined and restrained, for a period of one year, from accepting business from any Assigned or Related Account or Assigned Leads solicited in violation of paragraph 5 or whose records and information was used in violation of paragraph 4.

22.    On May 27, 1992, Bays also entered into a Financial Consultant Training Contract ("Training Contract") with SSB.[2] The Training Contract required Bays to keep SSB's proprietary client information confidential. It also contained the following non-solicitation covenant:

> A.    **Covenant not to solicit.** If I leave Shearson Lehman Brothers for any reason *I will not, within six (6) months of my leaving solicit any of the clients I serviced at Shearson Lehman Brothers or any clients I learned of during my employment at Shearson Lehman Brothers* (emphasis added).

---

[2] The Training Contract is with Shearson Lehman Brothers; however, SSB succeeded to Shearson's rights under the Training Contract.

A true and correct copy of Bays's Training Contract Agreement is attached to Plaintiff's Verified Complaint as Exhibit 11.

23.    On June 6, 1992, Bays also signed a Confidentiality Agreement (the agreement is with Shearson, however, as explained previously, SSB is a successor to this agreement) in which he agreed to keep SSB client information confidential and to return, at the time of his employment termination, all documents containing SSB confidential information. A true and correct copy of Bays's Confidentiality Agreement is attached to Plaintiff's Verified Complaint as Exhibit 12. Bays has also signed acknowledging his receipt of and agreement to be bound by SSB's Employee Handbook, which contains a policy requiring Bays to safeguard SSB's confidential information.

24.    On December 12, 1992, Edmiston also signed a Confidentiality Agreement in which she agreed to keep SSB client information confidential and to return, at the time of her employment termination, all documents containing SSB confidential information. A true and correct copy of Edmiston's Confidentiality Agreement is attached to Plaintiff's Verified Complaint as Exhibit 13. Edmiston has also signed off on SSB's Employee Handbook, which contains a policy requiring Edmiston to safeguard SSB's confidential information.

25.    On May 8, 1998, Bays entered into a Referral Agreement identical to Mills's Referral Agreement described above. A true and correct copy of Bays's Referral Agreement is attached to Plaintiff's Verified Complaint as Exhibit 10. In exchange for Bays' agreement not to solicit any referred accounts for one year following the termination of his employment, SSB client accounts were referred to Bays. As set forth in paragraphs 10-11 above, Bays has breached his agreement not to solicit SSB client accounts referred to him.

- 9 -

26.   On March 29, 1996, Edmiston entered into a Sales Assistant Agreement with Smith Barney, SSB's predecessor. The Sales Assistant Agreement: (i) prohibits Edmiston from using or disclosing SSB's confidential information; (ii) requires her to return SSB confidential information upon her termination; (iii) prohibits her from soliciting SSB's customers for twenty-four (24) months following her termination; and (iv) entitles SSB to obtain an injunction restraining her from soliciting SSB's customers and using or disclosing SSB's confidential information. A true and correct copy of Edmiston's Sales Assistant Agreement is attached to Plaintiff's Verified Complaint as Exhibit 14.

27.   On April 24, 2001, Williams signed a Confidential/Proprietary Information Acknowledgment with SSB in which she agreed: (i) to keep SSB client information confidential; (ii) to return, at the time of her employment termination, all documents containing SSB confidential information; and (iii) that SSB may obtain an injunction against her to prevent her breach of the agreement. A true and correct copy of Williams's Confidential/Proprietary Information Acknowledgment is attached to Plaintiff's Verified Complaint as Exhibit 15. Williams also signed off on SSB's Employee Handbook, which contains a policy requiring Williams to safeguard confidential information.

28.   To protect itself from unfair competition, SSB makes substantial efforts to ensure the confidentiality of information concerning its clients. In return for the Defendants signing the above described agreements to preserve the confidentiality of SSB client information, SSB provided Defendants with trade secrets and proprietary information. Further, in addition to the contractual provisions set forth above, SSB requires its financial consultants and sales assistants to abide by employee policies and procedures that specifically identify client

- 10 -

information as SSB property and prohibit the use or disclosure of this information other than in connection with SSB's business. Moreover, SSB maintains policies safeguarding client information to protect customers' privacy interests and keep this information strictly internal so that it does not fall into the hands of SSB's competitors. These policies prohibit providing client information to any third party. Obviously, any disclosure of SSB's client information to competitors would give those competitors a substantial, unfair advantage in soliciting SSB's customers.

29.    The SSB branch in which Defendants worked exerts substantial efforts to maintain the secrecy and confidentiality of SSB's client records, including information identifying its clients. SSB keeps its office locked and secure during non-working hours, and a security firm monitors the building. The computer system is password-protected, and only the broker, his or her sales assistant, the branch manager, and necessary operational personnel have access to the broker's account information. Financial consultants and sales assistants do not have access to other financial consultants' account information unless authorized. Customer information that SSB is required to maintain is kept secure in the broker's offices or in the operations area, a locked, restricted area. SSB also incinerates its clients' statements after a length of time.

30.    SSB derives actual and potential economic value from its customer information and customer lists in part because this information is not generally known to, and not readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use.

- 11 -

31.     Should Defendants continue with their efforts to lure accounts away from SSB and use and

disclose SSB's trade secret and confidential information, SSB will suffer immediate harm

that cannot be undone.


<br>

_____
Steve Balaban


Sworn to and subscribed before me on August ⟨28⟩, 2001.

_____
Notary Public in and for the State of Texas

My commission expires:

__8-23-2004__


H-280131.1



August 24, 2001

To Whom It May Concern:

Effective immediately please accept this as my letter of resignation from Salomon Smith Barney.  Should you have any questions please contact my legal counsel, Retta Miller with the firm of Jackson & Walker @ 214-953-6000

Sincerely,

Stephen Mills

August 24, 2001

To Whom It May Concern:

Effective immediately please accept this as my letter of resignation from Salomon Smith Barney.  Should you have any questions please contact my legal counsel, Retta Miller with the firm of Jackson & Walker @ 214-953-6000

Sincerely,

Stuart Bradley Bays

August 24, 2001

To Whom It May Concern:

Effective immediately please accept this as my letter of resignation from Salomon Smith Barney.

Sincerely,

Jackie Edmiston
Jackie Edmiston

August 24, 2001

To Whom It May Concern:

Effective immediately please accept this as my letter of resignation from Salomon Smith Barney.

Sincerely,

Rebecca Williams

 **Prudential**

Prudential Securities Incorporated
6101 South Broadway, Suite 490
Tyler, TX 75703
Tel 903 561-6980  800 619-1638
Fax 903 561-3410

Farrell Blevins
11510 CR 290
Tyler, TX  75707-4838

Dear Farrell:

We are proud to announce that after much thought and consideration, we have made the decision to move our to the investment firm of Prudential Securities Incorporated in Tyler, Texas.

In deciding to join Prudential Securities, our decision was first and foremost guided by our concerns for you and other clients. After careful research, we are convinced that Prudential Securities can provide you with virtually every service you currently have available as well as some new ones. We feel strongly that this change will help you benefit from the competitive services offered by Prudential Securities, such as: **Account fees, performance reporting, investment flexibility and comprehensive financial planning.**

Prudential Securities is one of the leading investment firms in the country, offering a broad and diversified range of investment products and services. Prudential Securities is a stable, reliable company that was founded over a century ago.

Let us assure you that the transfer of your account(s) will be a smooth and effortless process, with an uninterrupted continuity of service. Transfer documentation is included with this letter. To authorize the transfer of your accounts, please sign as indicated and return the documents in the envelope provided. Other required account documents, if necessary, will be forthcoming.

We will be calling you in the next few days. However, if you have questions, please feel free to call us at the office at 903-579-3713 or 800-619-1638. Thank you in advance for your trust and confidence.

Sincerely,

Stephen M. Mills
Senior Vice President – Investments

Brad Bays
Vice President – Investments

Enclosure

08/27/01  MON 16:15 FAX 713 5.. 2605        HAYNES & BOONE                    ☑001

 **Prudential**

Prudential Securities Incorporated
6101 South Broadway, Suite 490
Tyler, TX 75703
Tel 903 561-6960  800 619-1638
Fax 903 561-3410

Ken W. Good
3412 Storey Lake Dr.
Tyler, TX  75707-1760

Dear Ken:

I am proud to announce that after much thought and consideration, I have made the decision to move my business and have accepted the position of Vice President – Investments for the investment firm of Prudential Securities Incorporated in Tyler, Texas.

In deciding to join Prudential Securities, my decision was first and foremost guided by my concerns for you and other clients. After careful research, I am convinced that Prudential Securities can provide you with virtually every service you currently have available as well as some new ones. I feel strongly that this change will help you benefit from the competitive services offered by Prudential Securities, such as: **Account fees, performance reporting, investment flexibility and comprehensive financial planning.**

Prudential Securities is one of the leading investment firms in the country, offering a broad and diversified range of investment products and services. Prudential Securities is a stable, reliable company that was founded over a century ago.

Let me assure you that the transfer of your account(s) will be a smooth and effortless process, with an uninterrupted continuity of service. Transfer documentation is included with this letter. To authorize the transfer of your accounts, please sign as indicated and return the documents in the envelope provided. Other required account documents, if necessary, will be forthcoming.

I will be calling you in the next few days. However, if you have questions, please feel free to call me at the office at 903-579-3712 or 800-619-1638. Thank you in advance for your trust and confidence.

Sincerely,

Brad Bays
Vice President – Investments

Enclosure

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SALOMON SMITH BARNEY INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. _____ |
| | § | |
| STEPHEN M. MILLS, ET AL., | § | |
| | § | |
| Defendants. | § | |

STATE OF TEXAS        §
                      §
COUNTY OF SMITH       §

### AFFIDAVIT OF MARINA SCHROEDER

On this day, Marina Schroeder, appeared before me, the undersigned Notary Public. Ms. Schroeder is personally known to me and, upon her oath, deposed and stated as follows:

1.  My name is Marina Schroeder. I am over the age of 18 and am competent in all respects to make this Affidavit. The facts stated herein are within my personal knowledge true and correct.

2.  I am employed as a financial consultant in the Tyler, Texas branch of Salomon Smith Barney, Inc. ("SSB"). In that capacity, I knew Stephen M. Mills. Mr. Mills was formerly a financial consultant at the Tyler branch of SSB.

3.  On Monday, August 27, 2001, I spoke with Chris Ewert, a Salomon Smith Barney client whose account had been serviced by Mr. Mills prior to Mills' resignation. Mr. Ewert advised me that he had received a telephone call from Mr. Mills informing him that Mr. Mills had

moved to Prudential Securities and asking Mr. Ewert to move his account from SSB to Prudential.

Further affiant saith not.



_____
Marina Schroeder

Sworn to and subscribed before me on August 27, 2001.

_____
Notary Public in and for the State of Texas

My commission expires:

8-23-2004
_____

CHRISTI MONDS
NOTARY PUBLIC
State of Texas
Comm. Exp.08-23-2004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

SALOMON SMITH BARNEY INC., §
§
    *Plaintiff,* §
§
v. § No. _____
§
STEPHEN M. MILLS, ET AL., §
§
    *Defendants.* §


STATE OF TEXAS §
§
COUNTY OF SMITH §

### AFFIDAVIT OF DIANNE HELLEN

On this day, Dianne Hellen, appeared before me, the undersigned Notary Public. Ms. Hellen is personally known to me and, upon her oath, deposed and stated as follows:

1.    My name is Dianne Hellen. I am over the age of 18 and am competent in all respects to make this Affidavit. The facts stated herein are within my personal knowledge true and correct.

2.    I am employed as a financial consultant in the Tyler, Texas branch of Salomon Smith Barney, Inc. ("SSB"). In that capacity, I knew Jacqueline ("Jackie") F. Edmiston. Ms. Edmiston was a registered sales assistant who worked with Stephen Mills and Stuart Bays.

3.    On or about Thursday, August 23, 2001 and Friday, August 24, 2001, I personally observed Ms. Edmiston printing numerous SSB Client Profile Reports from the SSB computerized database. Ms. Edmiston and I were both at the printer removing printed items and I

commented to Ms. Edmiston about the large number of client Profile Reports she was printing. Ms. Edmiston stated that she was printing the Profile Reports for her back up files.

4.     The SSB Client Profile Reports are for internal use only and so state. The Profile Reports contain SSB client information including name and address, phone number, financial information such as investment objectives and income data, personal information and account history information. From my experience, SSB financial consultants and sales assistants are routinely advised that such information regarding SSB clients is confidential and proprietary SSB information.

Further affiant saith not.

Dianne Hellen

Sworn to and subscribed before me on August 27, 2001.

Notary Public in and for the State of Texas

My commission expires:

8-23-2004



CHRISTI MONDS
NOTARY PUBLIC
State of Texas
Comm. Exp.08-23-2004

# SMITHBARNEY

A Member of TravelersGroup™

## ACCOUNT REFERRAL/ASSIGNED LEAD AGREEMENT

This Account Referral/Assigned Lead Agreement (the "Agreement") is entered into between Smith Barney Inc. ("Smith Barney") and

_Steve Mills_ (the "FC" or "I" or "me") on this _8th_ day of _MAY_ , 19 _98_ .

WHEREAS, Smith Barney desires to assign an existing account or accounts and/or a lead to the FC in order for such account(s) to be serviced by the FC;

WHEREAS, the FC desires to have such account(s) and/or lead(s) assigned to him or her and to service such account(s);

WHEREAS, Smith Barney and the FC wish to set forth in writing their agreement with respect to the assignment.

NOW, THEREFORE, in consideration for the mutual covenants and promises set forth herein, it is agreed as follows:

**1. Assigned Accounts.** From time to time, Smith Barney shall assign to the FC one or more existing accounts (the "Assigned Accounts"). The Assigned Accounts shall be identified by name, account number and date of assignment on the schedule attached hereto.

**2. Assigned Leads.** From time to time, Smith Barney shall assign to the FC one or more leads (the "Assigned Lead"). An Assigned Lead is a lead which has some prior relationship and/or connection with Smith Barney, its parents, subsidiaries or affiliates. The Assigned Lead shall be identified by a name and date of assignment, on the schedule attached hereto.

**3. Related Accounts.** From time to time, the Assigned Accounts or Assigned Leads may refer new accounts to the FC from the same household or elsewhere (the "Related Accounts"). The FC recognizes and understands that the Related Accounts are directly derived from the Assigned Accounts or Assigned Leads and that the commissions generated from such accounts will partially inure to the benefit of the FC.

**4. Confidential Information.** The FC recognizes and agrees that *all records* whether original, duplicated, computerized, memorized, handwritten, or in any other form, and *all information* contained therein, including names, addresses, phone numbers, and financial information of the Assigned Accounts, Assigned Leads and Related Accounts, are confidential and are the sole and exclusive property of Smith Barney. This information, whether provided to me by Smith Barney or by any Assigned Accounts, Assigned Leads and Related Accounts, is entrusted to me as an employee and sales representative of Smith Barney. I will not use this information or remove any records pertaining thereto from any Smith Barney office except for the sole purpose of conducting business on behalf of Smith Barney. I agree not to divulge or disclose this information or any records pertaining thereto, to any competitor of Smith Barney either during my employment or at any time thereafter.

**5. Covenant Not to Solicit.** If, at any time, I resign from Smith Barney, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any of the Assigned Accounts, Assigned Leads or Related Accounts. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any such account:

(a) to transfer from Smith Barney to me or to my new employer, or

(b) to open a new account with me or with my new employer, or

(c) to otherwise discontinue its patronage and business relationship with Smith Barney.

**6. Breach of Covenants.** In the event I breach any of the covenants of paragraphs 4 or 5, I agree that Smith Barney will be entitled to injunctive relief. I recognize that Smith Barney will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Smith Barney or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION ordering:

(a) that I immediately return to Smith Barney all records relating to the Assigned or Related Accounts or Assigned Leads whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

(b) that, for a period of one year, I be enjoined and restrained from soliciting any Assigned or Related Account or Assigned Lead; and

(c) that I be further enjoined and restrained, for a period of one year, from accepting business from any Assigned or Related Account or Assigned Leads solicited in violation of paragraph 5 or whose records and information was used in violation of paragraph 4.

**7. Jurisdiction.** For the purposes of paragraph 6, I agree to submit to, and confer jurisdiction on, the United States District Court or the State Court which has original jurisdiction for the judicial district or county in which I last worked for Smith Barney. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction.

**8. Acknowledgments.** This agreement is intended to supplement Smith Barney's other confidentiality policies, agreements and covenants. It is not intended, nor should it be construed to be a modification or substitution for such other confidentiality policies, agreements and covenants. I also acknowledge that Smith Barney reserves the right to reassign to another FC at any time any of the Assigned Accounts, Related Accounts or Assigned Leads for which I am the FC of record. I have read and reviewed this agreement in its entirety. I have been given an opportunity to ask Smith Barney questions about it. I have also been given an opportunity to consult with an attorney of my choice. I fully understand the terms of this document and knowingly and freely agree to abide by them.

FINANCIAL CONSULTANT _R. Mill_

Date _5-8-98_

BRANCH OFFICE MANAGER

Date _5-8-98_

5586 (10/97)

SALOMON SMITH BARNEY

A member of citigroup

# Employee
# Handbook

**Employment
At-Will**

We believe that the employment relationship will be one of mutual satisfaction and benefit to both you and the Firm. However, there is no contractual right or obligation for either you to remain in the employment of the Firm or for the Firm to continue to employ you for any period of time. In the absence of a written agreement signed by the Chief Executive Officer, or his designee, the employment relationship at Salomon Smith Barney is "at-will". This entitles you and the Firm to terminate the employment relationship at any time for no reason or any reason, not otherwise prohibited by law, without providing prior notice, warning or discipline. Additionally, the terms and conditions of employment, including compensation, benefits and privileges, can be changed or terminated without cause and without notice at any time, at the sole discretion of Salomon Smith Barney.

**Principles
of Employment**

It is in everyone's best interests to understand what we refer to as our "Principles of Employment."

— First, you must observe the policies which we publish from time to time for employees. These include a requirement that you maintain the highest standards of conduct and act within the highest ethical principles. You must not do anything which may be a conflict of interest with your responsibilities as an employee. These expectations are included in the Statement of Business Practices and the Employee Handbook which are available for your review prior to your acceptance of employment. You will be asked to acknowledge receiving a copy of the Employee Handbook. Remember—it is your responsibility to read and understand these policies and expectations. If you have any questions, now or in the future, please ask your Human Resources Generalist or Employee Relations.

— Second, you must never use (except when necessary in your employment  with us) nor disclose with anyone not affiliated with Citigroup or its affiliates or subsidiaries any confidential or unpublished information you obtain as a result of your employment with us. This applies both while you are employed with us and after that employment ends. If you leave our employment, you may not retain or take with you any writing or other record which relates to the above.

— Third, your employment with us requires your full attention. Any invention, development or improvement made by you during the time you are employed by us which pertains to our business belongs to us and you agree to assign any interest you have in these things to us upon our request.

— Fourth, you agree to follow our dispute resolution/arbitration procedure for resolving all disputes" based on legally protected rights (i.e., statutory, contractual, or common law rights) that may arise between you and Salomon Smith Barney or its parent, affiliates, officers, directors, employees and agents. This applies while you are employed with us as well as after your employment ends. While we hope that disputes with our employees will never arise, we want them resolved promptly if they do arise. These procedures do not preclude us from taking disciplinary actions (including terminations) at any time, but if you dispute those actions, we both agree that the disagreement will be resolved through these procedures. Our procedures are divided into two parts. First, an internal dispute resolution procedure which allows you to seek review of any action taken regarding your employment or termination of your employment which you think is wrong and violates your legally protected rights. Second, in the unusual situation when this procedure does not fully resolve such dispute, you and we agree to waive any applicable statute of limitations and to submit the dispute, within one year of the date it arose, to binding arbitration before the arbitration facilities of the National Association of Securities Dealers Inc. ("NASD") or where the NASD declines the use of its facilities, before the American Arbitration Association, in accordance with the arbitration rules of that body then in effect and as supplemented by the Salomon Smith Barney Arbitration Policy ("Arbitration Policy"). A detailed description of the Arbitration Policy is available in *Appendix A* to the Employee Handbook for your review. Again, it is your responsibility to read and understand the dispute resolution/arbitration procedure. If you have any questions, now or in the future, please ask your Human Resources Generalist.

## Confidential and/or Material, Non-Public Information

Employees may create, discover or receive proprietary and/or confidential information. Such information may be in Firm documents, computer programs, databases, client documents, client lists, trading strategies and analytic models. Confidential information may also be "material, non-public information" under the federal securities laws and the Firm's policies.

Employees should assume that all nonpublic or unpublished information is confidential. Examples of confidential information include information about a client's securities positions, pending orders or plans to raise capital. It may also be information about the marketplace or major developments regarding the earnings or business of a company that is not a client, including a proposed tender offer, divestiture, recapitalization, bankruptcy, etc. Confidential information may also be information about the Firm—its operations, results, strategies, client lists, etc.

You have an obligation to safeguard confidential information whether generated internally or acquired from other sources and to use it only in the performance of your employment responsibilities.

Confidential information may also constitute "material, non-public information" which is subject to legal prohibitions on insider trading and to the Firm's policies and procedures concerning information barriers, restricted lists and the like.

Carefully review Firm policies on Confidential Information for complete details on employee obligations regarding the use and protection of confidential and material non-public information.

## Outside Activities

Employees must obtain written consent from the Firm before engaging in any other business, accepting employment or compensation from any other person, or serving as an officer, director, partner, or employee of another business, or organization. The level of management approval required varies depending on the nature of the affiliation and the type of organization involved. You should consult the Firm policy on Outside Affiliations for more details or call the Compliance Department.

## Required Reporting

Employees must notify the Compliance Department and Manager if they become, or have ever been, the subject of:

— any investigation or proceeding by any governmental or securities industry self-regulatory body, including any request for testimony before such bodies;

— any refusal of registration, injunction, censure, fine, suspension, expulsion or other disciplinary action by any governmental or securities regulatory body;

— any client complaint or disciplinary action by another broker/dealer;

— any bankruptcy or contempt proceeding, cease or desist order, injunction or civil judgment as a party defendant;

— any arrest, summons, subpoena, arraignment, indictment or conviction for a criminal offense; or

— any securities-related lawsuit or a request to testify in any securities-related lawsuit.

# Employee Handbook Receipt Form

I have received the Salomon Smith Barney Interim Employee Handbook which has been given to me and/or which is located on FCI under the verb "HR" or available from my manager. I will comply with all the Policies and Procedures of Salomon Smith Barney. I will take responsibility for having any questions about any policies answered. This document does not create a contract between Salomon Smith Barney and me for employment for any definite period of time or for the providing of benefits of any type for any definite period of time, and I understand that any and all policies, programs or benefits described therein may be modified or amended by the Firm in any manner or at any time and do not alter the fact that I am an "at-will" employee.

I agree to be bound by the Travelers/Salomon Smith Barney Principles of Employment, which includes a predispute, employment arbitration provision, as part of entering into, or continuing, an employment relationship with Salomon Smith Barney.

I understand it is my responsibility to read the Salomon Smith Barney Interim Employee Handbook carefully and if I do not understand any portion of it, to see my manager or Human Resources Generalist for an explanation.

**Complete this form and return it to your manager.**

_____
Signed

2/24/98
_____
Date

Stephen M. Mills
_____
Name (please print)

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
_____
Social Security Number

FC - 777
_____
Department

_Managers should forward their_
_employees signed copies of this form to:_
_Data Management_
_388 Greenwich Street_
_7th floor_
_New York, NY 10013_

ATTACHMENT #5

# EMPLOYEE HANDBOOK
# RECEIPT FORM

I have reviewed the Smith Barney Employee Handbook which is located on FCI under the verb "HR" or available from my manager. I will comply with all the Policies and Procedures of the Company. I will take responsibility for having any questions about any policies answered. This document does not create a contract between the Company and me for employment for any definite period of time or for the providing of benefits for any definite period of time and does not alter the fact that I am an "at-will" employee.

I understand it is my responsibility to read the handbook carefully and if I do not understand any portion of it, to see my manager or Human Resources department for an explanation.

Complete this form and return it to your manager.

Signed: _____     Date: _8/12/92_

Name (please print): _Steve Mills_

Social Security #: _406 - 78 - 8366_ Department: _777_

FOR INTERNAL USE ONLY
All rights reserved. Any use of this publication for purposes outside of the business of Smith Barney Inc. is strictly prohibited.

17

2/14/97

# Employee Handbook Receipt Form

I have received the Salomon Smith Barney Interim Employee Handbook which has been given to me and/or which is located on FCI under the verb "HR" or available from my manager. I will comply with all the Policies and Procedures of Salomon Smith Barney. I will take responsibility for having any questions about any policies answered. This document does not create a contract between Salomon Smith Barney and me for employment for any definite period of time or for the providing of benefits of any type for any definite period of time, and i understand that any and all policies, programs or benefits described therein may be modified or amended by the Firm in any manner or at any time and do not alter the fact that I am an "at-will" employee.

I agree to be bound by the Travelers/Salomon Smith Barney Principles of Employment, which includes a predispute, employment arbitration provision, as part of entering into, or continuing, an employment relationship with Salomon Smith Barney.

I understand it is my responsibility to read the Salomon Smith Barney Interim Employee Handbook carefully and if I do not understand any portion of it, to see my manager or Human Resources Generalist for an explanation.

**Complete this form and return it to your manager.**

_____
Signed

3-5-75
_____
Date

Brid B.y s
_____
Name (please print)

456 - 65 - 7930
_____
Social Security Number

777 - Tyler
_____
Department

*Managers should forward their*
*employees signed copies of this form to:*
*Data Management*
*388 Greenwich Street*
*7th floor*
*New York, NY 10013*

ATTACHMENT #5

# EMPLOYEE HANDBOOK
# RECEIPT FORM

I have reviewed the Smith Barney Employee Handbook which is located on FCI under the verb "HR" or available from my manager.  I will comply with all the Policies and Procedures of the Company.  I will take responsibility for having any questions about any policies answered.  This document does not create a contract between the Company and me for employment for any definite period of time or for the providing of benefits for any definite period of time and does not alter the fact that I am an "at-will" employee.

I understand it is my responsibility to read the handbook carefully and if I do not understand any portion of it, to see my manager or Human Resources department for an explanation.

Complete this form and return it to your manager.

Signed: _____   Date: _8-12-97_

Name (please print): _Brad Bays_

Social Security #: _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_   Department: _777 Tyler_

FOR INTERNAL USE ONLY

All rights reserved. Any use of this publication for purposes outside of the business of Smith Barney Inc. is strictly prohibited.

17

2/14/97

# Employee Handbook Receipt Form

I have received the Salomon Smith Barney Interim Employee Handbook which has been given to me and/or which is located on FCI under the verb "HR" or available from my manager. I will comply with all the Policies and Procedures of Salomon Smith Barney. I will take responsibility for having any questions about any policies answered. This document does not create a contract between Salomon Smith Barney and me for employment for any definite period of time or for the providing of benefits of any type for any definite period of time, and I understand that any and all policies, programs or benefits described therein may be modified or amended by the Firm in any manner or at any time and do not alter the fact that I am an "at-will" employee.

I agree to be bound by the Travelers/Salomon Smith Barney Principles of Employment, which includes a predispute, employment arbitration provision, as part of entering into, or continuing, an employment relationship with Salomon Smith Barney.

I understand it is my responsibility to read the Salomon Smith Barney Interim Employee Handbook carefully and if I do not understand any portion of it, to see my manager or Human Resources Generalist for an explanation.

**Complete this form and return it to your manager.**

Jacqueline J. Edmiston
**Signed**

02/24/98
**Date**

Jacqueline F. Edmiston
**Name (please print)**

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
**Social Security Number**

Tyler, TX Branch (777)
**Department**

*Managers should forward their*
*employees signed copies of this form to:*
*Data Management*
*388 Greenwich Street*
*7th floor*
*New York, NY 10013*

ATTACHMENT #5



# EMPLOYEE HANDBOOK
# RECEIPT FORM

I have reviewed the Smith Barney Employee Handbook which is located on FCI under the verb "HR" or available from my manager. I will comply with all the Policies and Procedures of the Company. I will take responsibility for having any questions about any policies answered. This document does not create a contract between the Company and me for employment for any definite period of time or for the providing of benefits for any definite period of time and does not alter the fact that I am an "at-will" employee.

I understand it is my responsibility to read the handbook carefully and if I do not understand any portion of it, to see my manager or Human Resources department for an explanation.

Complete this form and return it to your manager.

Signed: _Jackie Edmiston_   Date: _03/03/97_

Name (please print): _Jackie Edmiston_

Social Security #: _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_   Department: _____

FOR INTERNAL USE ONLY
All rights reserved. Any use of this publication for purposes outside of the business of Smith Barney Inc. is strictly prohibited.

2/14/97



**EMPLOYEE HANDBOOK RECEIPT**

I have received the Salomon Smith Barney Employee Handbook which has been given to me and/or which is located on Salomon Smith Barney's Human Resources intranet website (http://web004.smb.com/intranet/HR) or available from my manager. I will comply with all the Policies and Procedures of Salomon Smith Barney. I will take responsibility for having any questions about any policies answered. This document does not create a contract between Salomon Smith Barney and me for employment for any definite period of time or for the providing of benefits of any type for any definite period of time, and I understand that any and all policies, programs or benefits described therein may be modified or amended by the Firm in any manner or any time and do not alter the fact that I am an "at-will" employee.

I agree to be bound by the Salomon Smith Barney Principles of Employment, which includes a predispute, employment arbitration provision, as part of entering into, or continuing, an employment relationship with Salomon Smith Barney.

I understand it is my responsibility to read the handbook carefully and if I do not understand any portion of it, to see my manager or Human Resources Generalist for an explanation.

| Employee's Signature | Print Name | Date |
|---|---|---|
| Rebecca Williams | Rebecca Williams | 4/24/01 |

5296V (3/90)

/0

# SMITH BARNEY

## ACCOUNT REFERRAL/ASSIGNED LEAD AGREEMENT

A Member of TravelersGroup™

This Account Referral/Assigned Lead Agreement (the "Agreement") is entered into between Smith Barney Inc. ("Smith Barney") and

_____ (the "FC" or "I" or "me") on this _____ day of _MAY_ , 19 _98_ .

WHEREAS, Smith Barney desires to assign an existing account or accounts and/or a lead to the FC in order for such account(s) to be serviced by the FC;

WHEREAS, the FC desires to have such account(s) and/or lead(s) assigned to him or her and to service such account(s);

WHEREAS, Smith Barney and the FC wish to set forth in writing their agreement with respect to the assignment.

NOW, THEREFORE, in consideration for the mutual covenants and promises set forth herein, it is agreed as follows:

**1. Assigned Accounts.** From time to time, Smith Barney shall assign to the FC one or more existing accounts (the "Assigned Accounts"). The Assigned Accounts shall be identified by name, account number and date of assignment on the schedule attached hereto.

**2. Assigned Leads.** From time to time, Smith Barney shall assign to the FC one or more leads (the "Assigned Lead"). An Assigned Lead is a lead which has some prior relationship and/or connection with Smith Barney, its parents, subsidiaries or affiliates. The Assigned Lead shall be identified by a name and date of assignment, on the schedule attached hereto.

**3. Related Accounts.** From time to time, the Assigned Accounts or Assigned Leads may refer new accounts to the FC from the same household or elsewhere (the "Related Accounts"). The FC recognizes and understands that the Related Accounts are directly derived from the Assigned Accounts or Assigned Leads and that the commissions generated from such accounts will partially inure to the benefit of the FC.

**4. Confidential Information.** The FC recognizes and agrees that *all records* whether original, duplicated, computerized, memorized, handwritten, or in any other form, and *all information* contained therein, including names, addresses, phone numbers, and financial information of the Assigned Accounts, Assigned Leads and Related Accounts, are confidential and are the sole and exclusive property of Smith Barney. This information, whether provided to me by Smith Barney or by any Assigned Accounts, Assigned Leads and Related Accounts, is entrusted to me as an employee and sales representative of Smith Barney. I will not use this information or remove any records pertaining thereto from any Smith Barney office except for the sole purpose of conducting business on behalf of Smith Barney. I agree not to divulge or disclose this information or any records pertaining thereto, to any competitor of Smith Barney either during my employment or at any time thereafter.

**5. Covenant Not to Solicit.** If, at any time, I resign from Smith Barney, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any of the Assigned Accounts, Assigned Leads or Related Accounts. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any such account:

(a) to transfer from Smith Barney to me or to my new employer, or

(b) to open a new account with me or with my new employer, or

(c) to otherwise discontinue its patronage and business relationship with Smith Barney.

**6. Breach of Covenants.** In the event I breach any of the covenants of paragraphs 4 or 5, I agree that Smith Barney will be entitled to injunctive relief. I recognize that Smith Barney will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Smith Barney or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a) that I immediately return to Smith Barney all records relating to the Assigned or Related Accounts or Assigned Leads whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

(b) that, for a period of one year, I be enjoined and restrained from soliciting any Assigned or Related Account or Assigned Lead; and

(c) that I be further enjoined and restrained, for a period of one year, from accepting business from any Assigned or Related Account or Assigned Leads solicited in violation of paragraph 5 or whose records and information was used in violation of paragraph 4.

**7. Jurisdiction.** For the purposes of paragraph 6, I agree to submit to, and confer jurisdiction on, the United States District Court or the State Court which has original jurisdiction for the judicial district or county in which I last worked for Smith Barney. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction.

**8. Acknowledgments.** This agreement is intended to supplement Smith Barney's other confidentiality policies, agreements and covenants. It is not intended, nor should it be construed to be a modification or substitution for such other confidentiality policies, agreements and covenants. I also acknowledge that Smith Barney reserves the right to reassign to another FC at any time any of the Assigned Accounts, Related Accounts or Assigned Leads for which I am the FC of record. I have read and reviewed this agreement in its entirety. I have been given an opportunity to ask Smith Barney questions about it. I have also been given an opportunity to consult with an attorney of my choice. I fully understand the terms of this document and knowingly and freely agree to abide by them.

FINANCIAL CONSULTANT _____

Date _5-8-98_

BRANCH OFFICE MANAGER _____

Date _7/8/98_

5586 (10/97)



# FINANCIAL CONSULTANT TRAINING CONTRACT

**Parties:**
This is a binding contract between Shearson Lehman Brothers Inc. and its subsidiaries, successors and assigns ("hereinafter referred to as Shearson Lehman Brothers") and myself, Robert Bradley Bays a Shearson Lehman Brothers Financial Consultant Associate ("Associate" and also referred to in this contract as "I" or "me" as appropriate).

**Purpose and Intent:**
It is my desire to enroll in Shearson Lehman Brothers Financial Consultant Training Program. By executing this contract, Shearson Lehman Brothers agrees to employ me as an Associate. As part of its training program, Shearson Lehman Brothers agrees to expend considerable sums of money for my compensation, instruction, meals, lodging, transportation, entertainment, licensing and registration, as well as for operational and related costs for the time period. I am in the program. In consideration of these expenditures by Shearson Lehman Brothers, the opportunities which will be afforded me during and after the training program and the support services and facilities which will be afforded to me, I represent that I will continue in Shearson Lehman Brothers' employ during and after completion of the training program, and that I will comply with the following terms of this contract.

**Confidentiality of Records:**
I understand that any client records and information including names and addresses and account information, whether generated by Shearson Lehman Brothers or me, are confidential and proprietary information as well as an important business asset of Shearson Lehman Brothers. I will use such originals or copies of information only in the normal course of Shearson Lehman Brothers' business and will not remove any client-related records from Shearson Lehman Brothers' premises during or after my employment, nor will I ever transfer such information to any third party either orally or in writing.

**Termination of Employment:**
A.      Covenant not to solicit. If I leave Shearson Lehman Brothers for any reason I will not, within six (6) months of my leaving solicit any of the clients I serviced at Shearson Lehman Brothers or any clients I learned of during my employment at Shearson Lehman Brothers.

B.      Termination by Shearson Lehman Brothers. I agree that Shearson Lehman Brothers may terminate my employment at its discretion at any time without notice.

**C.** **Reimbursement of Training Expenses.** As a reimbursement for my training costs and expenses, I agree to pay damages to Shearson Lehman Brothers in an amount described below if my employment is terminated for any of the following reasons: I terminate my employment, or I provoke my termination by words or conduct which would reasonably be expected to result in such termination by Shearson Lehman Brothers. My failure to pass the Series 7 New York Stock Exchange ("NYSE") examination does not constitute such provocation.

1. In the event my employment is terminated under subsection "C", prior to completion of twenty-five (25) months, I will pay Shearson Lehman Brothers the sum of thirty eight thousand ($38,000.00) dollars, which I understand represents the costs and expenses incurred by the Firm in training me, exclusive of salary. I hereby agree that this is a reasonable figure.

2. Shearson Lehman Brothers agrees that it will reduce this $38,000.00 damages figure by one thousand five hundred twenty dollars ($1,520.00) per month after my registration is approved by the NYSE and while employed by Shearson Lehman Brothers.

3. In the event that I am already registered with the NYSE, in consideration for the unique training Shearson Lehman Brothers will provide during the course of my training, I agree that, for purposes of this subsection, my registration will be considered "approved by the NYSE" in the month that members of my training class receive their production numbers. I agree that this production number will supersede any prior production numbers I may have.

4. In the event that I am already registered with the NYSE and enter the training program during or after Phase Three, the damage figure in paragraph D(1) shall be reduced to $37,000.

**D.** **Effect of termination on compensation.** I agree that if my employment is terminated for any reason, I will only be entitled to commissions, finder's fees, sales credits, bonuses or any other compensation which was credited to me on or prior to the effective day of my termination.

**Legal Liability and Enforcement:**
Any controversy arising under this contract relating to money damages or my employment or termination thereof, shall be arbitrated before and pursuant to the rules of, the New York Stock Exchange, Inc. or the National Association of Securities Dealers, Inc. Either party to this agreement may also seek injunctive or other equitable relief in any court of competent jurisdiction or any of the above listed arbitration forums to enforce the covenant of confidentiality if violated. I consent to the issuance of a temporary restraining order or preliminary or permanent injunction to maintain the status quo pending the outcome of any arbitration proceeding. In the event Shearson Lehman Brothers institutes legal or equitable proceedings to enforce or collect damages under this contract, I agree to pay Shearson Lehman Brothers' attorney's fees with interest and costs. Shearson

- 2 -

Lehman Brothers agrees to the issuance of injunctive relief by an arbitration panel and agrees to expedited arbitration before the New York Stock Exchange or National Association of Securities Dealers.

**Non-Waiver:**
I understand that Shearson Lehman Brothers may at various times decide not to enforce all or part of this contract or similar contracts with other Shearson Lehman Brothers Financial Consultant Associates. I agree that such instances of non-enforcement shall not constitute a waiver, and will not prevent Shearson Lehman Brothers from enforcing any or all of the remaining portions of this contract against me.

**Miscellaneous:**
1.      I will at all times comply with Shearson Lehman Brothers' internal policies and procedures, state and federal securities laws, and the rules of the various exchanges and other regulatory bodies to which Shearson Lehman Brothers is subject.

2.      This contract shall be governed in all respects by the laws of the State of New York.

3.      Nothing in this agreement is intended to conflict with or violate applicable law. Any interpretation of provisions of this agreement shall be limited, if necessary, to give legal affect to such terms by such applicable law.

4.      This contract represents my entire understanding with Shearson Lehman Brothers and may only be changed by a written agreement signed by myself and an authorized Shearson Lehman Brothers representative.

Dated: 5/27/92

FINANCIAL CONSULTANT ASSOCIATE
SHEARSON LEHMAN BROTHERS INC.

I acknowledge that I have received and read a copy of this contract prior to signing it, and understand the terms thereof. I acknowledge that I had been afforded the opportunity to consult with counsel with respect to my execution of this agreement.

FINANCIAL CONSULTANT ASSOCIATE

BY:

SHEARSON LEHMAN BROTHERS REPRESENTATIVE

- 3 -



# Confidentiality Agreement

| PRINT your name | Social Security Number |
|---|---|
| Stuart Bradley Bays | 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 |

In the course of your work, you may become aware of information of a confidential nature pertaining to the business of the Firm and its clients. The importance of preserving the confidentiality of such information and using it only for the purpose for which it was obtained cannot be overemphasized. Shearson Lehman Brothers Inc. ("Shearson") maintains policies and procedures with respect to the use and the dissemination of confidential information which are summarized below.

1. All information related to the business activities of the Firm and any of its subsidiaries and affiliated companies and their clients that may be obtained by you from any source as a result of your employment shall be considered as confidential. Materials contained in client files should always be regarded as confidential. You should always maintain appropriate administrative, technical and physical safeguards over records in your possession to prevent unauthorized access.

2. Information regarding the business methods, operations or results of Shearson or its clients may not be disclosed to competitors, to the public, or to any person. Nor can the preceding information be otherwise used except as your duties at Shearson may require or with the prior written approval of an authorized senior officer of Shearson. This applies to the period of your employment and thereafter. Trade practices, procedures, software, or other strategies which you develop in the course of performing your responsibilities or using Shearson equipment or facilities are the property of the Firm.

3. Material, non-public information relating to the activities or affairs of a client or relating to a proposed or contemplated corporate or public finance transaction may not be disclosed, even to co-workers and associates, unless you have obtained such information in the regular course of your duties and responsibilities at the Firm and such communication is necessary and appropriate in the performance of your duties and responsibilities. If you are employed in certain sensitive departments, separate, more detailed policies may also apply to you and will be distributed to you.

4. The execution of transactions for your own accounts or solicitations for the accounts of others is strictly prohibited when you "know" or have "reason to believe" that you possess material non-public information regarding the activities or affairs of the issuing company.

5. Upon termination of your employment, you are required to deliver to the Firm all documents or other tangible forms which you have in your possession which contain or are derived from confidential information relating the Firm or its clients.

Any employee who has questions or concerns with respect to the use or dissemination of information relating to the business activities or affairs of Shearson, its subsidiaries, affiliates or clients or relating to corporate or public finance transactions should consult with the Compliance Department, Law Department or the Firm-wide Coordinating Officer for guidance.

The Firm will take strong action (which may include termination of employment) against any person(s) making any improper use of confidential information or contributing to a breach of confidentiality.

| I have reviewed and agree to comply with the Shearson Employee Confidentiality Policy. | |
|---|---|
| Signature | |
| Department Tyler, Texas 777 | Date 6/1/92 |

4729KO (8/91)

/3



# Confidentiality Agreement

PRINT your name Jacqueline Frances Edmiston

Social Security Number 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

In the course of your work, you may become aware of information of a confidential nature pertaining to the business of the Firm and its clients. The importance of preserving the confidentiality of such information and using it only for the purpose for which it was obtained cannot be overemphasized. Shearson Lehman Brothers Inc. ("Shearson") maintains policies and procedures with respect to the use and the dissemination of confidential information which are summarized below.

1. All information related to the business activities of the Firm and any of its subsidiaries and affiliated companies and their clients that may be obtained by you from any source as a result of your employment shall be considered as confidential. Materials contained in client files should always be regarded as confidential. You should always maintain appropriate administrative, technical and physical safeguards over records in your possession to prevent unauthorized access.

2. Information regarding the business methods, operations or results of Shearson or its clients may not be disclosed to competitors, to the public, or to any person. Nor can the preceding information be otherwise used except as your duties at Shearson may require or with the prior written approval of an authorized senior officer of Shearson. This applies to the period of your employment and thereafter. Trade practices, procedures, software, or other strategies which you develop in the course of performing your responsibilities or using Shearson equipment or facilities are the property of the Firm.

3. Material, non-public information relating to the activities or affairs of a client or relating to a proposed or contemplated corporate or public finance transaction may not be disclosed, even to co-workers and associates, unless you have obtained such information in the regular course of your duties and responsibilities at the Firm and such communication is necessary and appropriate in the performance of your duties and responsibilities. If you are employed in certain sensitive departments, separate, more detailed policies may also apply to you and will be distributed to you.

4. The execution of transactions for your own accounts or solicitations for the accounts of others is strictly prohibited when you "know" or have 'reason to believe' that you possess material non-public information regarding the activities or affairs of the issuing company.

5. Upon termination of your employment, you are required to deliver to the Firm all documents or other tangible forms which you have in your possession which contain or are derived from confidential information relating the Firm or its clients.

Any employee who has questions or concerns with respect to the use or dissemination of information relating to the business activities or affairs of Shearson, its subsidiaries, affiliates or clients or relating to corporate or public finance transactions should consult with the Compliance Department, Law Department or the Firm-wide Coordinating Officer for guidance.

The Firm will take strong action (which may include termination of employment) against any person(s) making any improper use of confidential information or contributing to a breach of confidentiality.

---

*I have reviewed and agree to comply with the Shearson Employee Confidentiality Policy.*

Signature Jacqueline F. Edmiston

Department CSA - Dumas TX 718 - Midland Serial

Date 12-17-92

4729X0 (6/91)

# SMITH BARNEY INC.
## SALES ASSISTANT AGREEMENT

**Please print clearly**

Name: __Jacqueline F. Edmiston__        Social Security#: ___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___

Branch/P&L#: ___777___        Hire Date: __12/14/92__

Job Title: ___Registered Assistant___        Phone#: ___903-581-4344___

I understand that in the course of rendering my employment services to Smith Barney (the "Firm"), I will have access to, or be exposed to, confidential and proprietary information. In this regard, I hereby acknowledge that the list, or lists, of the Firm's customers, in whatever form or forms embodied, and as they may exist from time to time, and any other personal or financial information pertaining to such customers, including but not limited to their addresses, telephone numbers, investment objectives, interests or preferences, are valuable, special and unique assets of the business that the Firm has expended an immeasurable amount of time and money to acquire.

I will not, during or after the term of my employment, disclose the list(s) of customers or any other information pertaining to such customers or the manner in which the Firm conducts its business, to any person, Firm, corporation, association, or other entity for any reason or purpose whatever.

In addition, I agree that upon termination of my employment with the Firm, irrespective of its time, manner, or cause, I will surrender to the Firm all customer client lists and all books, records, documents, and other written information received or obtained by me which relate to the Firm's customers or business.

I further agree that for a period of twenty-four months following the termination of my association with the Firm, I will not directly or indirectly solicit, or cause to be solicited, any business from any of the Firm's customers, clients or accounts.

I agree and acknowledge that the restrictions contained herein are reasonable and necessary in light of the unique nature of the Firm's business, and that I have had the opportunity to have this agreement reviewed by my attorney, or such third party as I may deem advisable. I further acknowledge that my employment by the Firm is conditioned upon my agreement to the terms of this agreement, as is my continued employment by the Firm.

I agree that should I terminate from the Firm within one year of becoming registered, I will repay the Firm for all its costs incurred to become registered including but not limited to study materials and preparatory classes.

I agree that any payments made to me from a Financial Consultant(s) must be paid through the Firm's payroll cycle (payments made in the form of cash or personal check violate such policy.) I further understand that such payments are the sole obligation of the Financial Consultant(s) and not the obligation of the Firm.

I agree that this agreement, and any dispute arising thereunder, shall be decided in arbitration pursuant to the rules of the New York Stock Exchange at a hearing to be held by said organization in New York City, and I expressly consent to the jurisdiction of said organization.

Furthermore, I agree that the Firm shall be entitled to an injunction (from a court of competent jurisdiction) specifically restraining me from soliciting customers, clients and accounts, and/or from disclosing in whole or in part, the Firm's customer lists, confidential information or trade secrets.

Nothing herein shall be construed as prohibiting the Firm from pursuing any other remedies available to the Firm for such breach or threatened breach, including the recovery of damages from me.

Branch Manager        Date 03/29/96        Sales Assistant        Date 03/29/96

# SALOMON SMITH BARNEY
### A member of citigroup

## Confidential/Proprietary Information Acknowledgement

Employees may create, discover or receive proprietary and/or confidential information. Such information may be in Firm documents, computer programs, databases, client documents, client lists, trading strategies and analytic models. Confidential information may also be "material, non-public information" under the federal securities laws and the Firm's Chinese Wall Policy.

Confidential information can be information created by the Firm or information entrusted to the Firm by third parties, such as clients or suppliers, with the expectation that such information will not be shared with others outside the Firm. Internally generated information concerning investment banking transactions, analytical models created by research analysts, customer information and account activity, and new products in development are examples of confidential information. Employees should assume that all non-public or unpublished information is confidential.

Information is proprietary when the Firm has an ownership interest in the information, usually because such information has been invented or created by the employees of or consultants to the Firm. Typically, proprietary information is intrinsically valuable and provides the Firm with a competitive advantage. Examples of Salomon Smith Barney proprietary information include market prices created by the Firm, Salomon Smith Barney research reports, Salomon Smith Barney-created indices, business information about the Firm and software developed internally. Software and data licensed to Salomon Smith Barney by suppliers are examples of information proprietary to third parties.

Employees may not use, publish or otherwise disclose proprietary or confidential information except in furtherance of the Firm's business. In no event, should such information be used, published or otherwise disclosed subsequent to the termination of employment. A breach of this policy, or a threatened breach of this policy, will subject the Firm to immediate and irreparable harm. Therefore, employees must understand and agree that they are subject to an injunction to prevent the breach of this policy. Upon termination of employment, all originals and copies of proprietary and/or confidential information must be returned.

Understood and agreed.

Signature _Rebecca Williams_      Date _4/24/01_

5296U (3/99)